Petition of SKIBS A/S JOLUND, in a cause of exoneration from and limitation of liability for damages arising out of a fire on board THE BLACK GULL on July 18, 1952.

WURTTEMBERGISCHE UND BADISCHE VEREINIGTE VERICHERUNGSGESELLSCHAFTEN A. G., Libelants,

v.

BLACK DIAMOND STEAMSHIP CORPORATION and Black Diamond Lines, Inc., Respondents.

AMERICAN SMELTING & REFINING COMPANY, Atkinson Haserick & Co., Anglo Fabrics Company, et al., Libelants,

v.

BLACK DIAMOND STEAMSHIP CORPORATION and Black Diamond Lines, Inc., Respondents.

Maria Angelina VERBEECK, Maurice Verbeeck, Simone Verbeeck and Lee Verbeeck, Libelants,

v.

BLACK DIAMOND STEAMSHIP CORPORATION and Black Diamond Lines, Inc., Respondents.

United States District Court
S. D. New York.
July 23, 1956.

Pyne, Brush, Smith & Michelsen, New York City, for Skibs A/S Jolund, Warner Pyne and Dudley C. Smith, New York City, of counsel.

Bigham, Englar, Jones & Houston, New York City, for libelants, cargo claimants and death claimant, Henry N. Longley, and John W. R. Zisgen, New York City, of counsel.

Abberley, Kooiman & Amon, New York City, for seven passengers, John J. Abberley, and Frank Marcellino, New York City, of counsel.

Dow & Symmers, New York City, for Black Diamond S.S. Corp., Daniel L. Stonebridge and Raymond W. Mitchell, New York City, of counsel.

DIMOCK, District Judge.

This controversy arises out of a fire which occurred on the Norwegian M/V Black Gull, on July 13, 1952. As a result of this fire, the vessel became a constructive total loss and most of her cargo was either destroyed or damaged. Four members of the crew lost their lives. Other members of the crew and some of

the passengers allege that they were injured and that they lost their baggage and personal effects.

Four proceedings have been instituted as a result of this disaster. The first is a proceeding for exoneration from or limitation of liability instituted by Skibs A/S Jolund, owner of the Black Gull. The second and third cases are suits for non-delivery of and damage to the cargo which was on board the Black Gull at the time of the fire. Libelants, in those two suits, are the owners or underwriters of that cargo. Respondent in those suits, Black Diamond Steamship Corp., was the time charterer of the Black Gull and issued the bills of lading for the cargo carried on that voyage. The fourth proceeding is one for wrongful death of a Belgian mess-boy, brought by his widow and children against the same respondent. I have not attempted to distinguish between libelants and claimants and for purposes of this memorandum, I have grouped both under the term "libelants" except where otherwise indicated.

There is no real dispute about the facts leading up to the disaster. The vessel left Rotterdam on July 10, 1952, bound for United States east coast ports, the first of which was to be New York. She carried general cargo below decks which had been loaded at Bremen, Hamburg, Antwerp and Rotterdam. In addition, she carried on the weather deck approximately five hundred fifty tons of crude naphthalene in previously used jute or burlap bags which had been loaded in Antwerp and Rotterdam. The vessel on this voyage was manned by a crew of forty and carried nine passengers.

The crude naphthalene was stowed about six bags high. The stow covered both port and starboard sides of the afterdeck over an area of some 13–16 feet wide and approximately 90 feet long. The forward weather deck of the vessel, both port and starboard, contained an approximately similar stow of bagged crude naphthalene. In athwartship direction, the stow started just inboard of the bulwarks and continued to a line about three feet out from the sides of

the hatch coamings. A dunnage fence kept the stow clear of the bulwarks and permitted a three foot wide passageway through which members of the crew could pass. This passageway also kept sounding plugs and hose connections available to the crew. The stow was secured in place by rope nets but was otherwise uncovered.

On the evening of July 18, 1952, the vessel passed the Nantucket Shoals Light on her way to New York. At about 11 o'clock, the deck officer, standing on the starboard wing of the bridge, heard what he described as "a hollow dull dump" from the afterpart of the vessel. Looking in that direction, he saw smoke and a small flame coming from the after weather deck port side abreast number 4 hatch about 100 feet from his position on the bridge. After ordering water on deck, he went to the area in the vicinity of the smoke. He there saw fire in the middle of the top of the load and fire on the side of the load between the second and third tiers from the top.

Although an attempt was made to extinguish the fire, it was necessary to abandon the vessel about four and a half hours after the fire was discovered.

During the voyage, the temperatures ranged from a high of 77°F. to a low of 61°F. The last recording taken on the 4-8 p. m. watch on July 18th indicated a temperature of 72°F. These temperatures were taken on the bridge and therefore indicated the temperature in the shade only.

Passenger claimants state in their brief that the fire was caused in one of two ways. They state that it was caused either by external ignition from something like a cigarette butt or spark or that it was caused by spontaneous combustion in the stow of naphthalene. They further allege that negligence of the petitioner or respondent was responsible for the disaster, whether the physical cause of the fire was external ignition or spontaneous combustion.

In order to recover, libelants must prove that the fire was caused through design or neglect of the petitioner or respondent. Automobile Insurance Co. v. United Fruit Co., 2 Cir., 224 F.2d 72.

Here, there are two possible causes of the fire. Passenger claimants expressly conceded this point in their brief filed subsequent to trial. While the libelants have attempted to rule out spontaneous combustion as a cause of the fire, the evidence clearly shows it to be chemically possible. There was testimony of a "hollow dull dump" immediately before the fire was discovered. Dr. Purdy, respondent's expert, testified that a fire caused by ignition from a spark or cigarette butt on the top of the stow would probably not commence with such a sound. Since the bags were packed so closely together that no crevices remained between them, it is doubtful that an outside ignition source could have found its way below the top of the stow. In addition, the location of the start of the fire lends credibility to the possibility of spontaneous combustion. The first close investigation found the fire in the middle of the top of the stow and on the side of the stow between the second and third tiers from the top. Under cross-examination by the libelants, Dr. Purdy testified that a fire which started on the top of the stow would not naturally work directly downward; rather, he stated, it would be expected to flame over the surface and through the flow of melting naphthalene to distribute the fire. On the other hand, a fire which started within the stow would naturally work out to the side at that level and work up to the top directly above it. This is exactly the position of the fire when first investigated. Thus, since a fire resulting from spontaneous combustion would start within the stow, this lends further strength to that possibility in this disaster.

Dr. Purdy, the expert called by respondent, testified as to the possibility of spontaneous combustion of the bagging having caused this fire. He stated that self-heating may cause a fire in previously used bags in which impurities from prior commodities might remain. In two tests he ran involving similar bagging, some self-heating resulted. From these

experiments he stated that, without definitely knowing that no impurities were present in the bags on the Black Gull, spontaneous combustion was chemically possible. Both Dr. Purdy and Dr. Snell, the experts called by libelants, agreed that, once the bagging started to burn, the heat from the burning bagging would ignite the naphthalene.

There being no direct testimony as to an external ignition, spontaneous combustion of the bagging cannot be eliminated as a possible cause of the fire.

█ Libelants must prove that petitioner or respondent was negligent and that negligence was the cause of the fire whether it was started by external ignition or by spontaneous combustion. Without this proof, the fire might have been caused without any negligence on the part of petitioner. In that event, libelants would be barred from recovery. Automobile Insurance Co. v. United Fruit Co., 2 Cir., 224 F.2d 72, supra.

█ There are, therefore, two questions that are immediately before me. They are: (1) If the fire was caused by spontaneous combustion, did any negligence of petitioner or respondent cause the spontaneous combustion? (2) If the fire was caused by external ignition, did the failure to cover the stow of naphthalene with a tarpaulin proximately cause the fire? I will discuss these questions separately.

1. Libelants contend that, if spontaneous combustion occurred, it could only have done so because of foreign impurities in the bags. Otherwise a rising temperature in the crude naphthalene itself would have caused the naphthalene to melt and consequently cool before it reached its flash point.

Libelants then contend that petitioner or respondent was negligent in allowing the use of bags soiled with impurities and in not providing sufficient ventilation so that spontaneous combustion would be prevented.

So far as evidence is concerned libelants left this issue severely alone. There is no evidence that the impurities on the material of the bags which would render naphthalene susceptible to spontaneous combustion would be discoverable on inspection. Libelants do not go to the extent of saying that the danger inherent in stowing naphthalene in second hand bags was so notorious that the petitioner or respondent should have refused to accept the cargo. They suggest that loose stowage permitting ventilation would inhibit spontaneous combustion but no evidence was offered that there was any feasible method of stowage which would have that effect. No explanation was vouchsafed as to how those responsible for the ship could permit the ventilation alleged to be necessary to inhibit spontaneous combustion and, at one and the same time, envelop the cargo with the tarpaulins alleged to be necessary to protect it from sparks and cigarette butts. I find that libelants have failed to sustain the burden of proof that the petitioner or respondent was negligent in accepting cargo in a condition susceptible to spontaneous combustion or in failing to stow it so as to inhibit spontaneous combustion.

2. In discussing this possibility of outside ignition, I shall assume, without deciding the question, that the failure to cover the stow with a tarpaulin was either negligent or in violation of a controlling statute or regulation. I therefore turn to the question whether this failure to cover the stow with a tarpaulin proximately caused the fire.

Libelants' argument that a tarpaulin would have prevented ignition from an external source runs something like this: The danger of ignition of crude naphthalene is increased by heating. As the temperature rises, greater amounts of readily-ignitable gases are given off. Since the temperature in the area of the stow was in excess of 120°F, the naphthalene was giving off a substantial quantity of gases which impregnated the bagging and made the bagging susceptible to ignition from a spark or cigarette butt. In addition, the bagging was impregnated with creosote oil from the crude naphthalene which is also readily ignitable.

From these allegations libelants argue that a tarpaulin would have protected the stow from heating by the direct rays of the sun and would have prevented contact between a spark or cigarette butt and the bagging impregnated with creosote oil and gases.

I cannot accept libelants' contention. First of all, the testimony is overwhelming that the sun's rays could not have caused or contributed to the cause of the fire. Both Dr. Purdy, respondent's expert, and Mr. Aeby, whom libelants assert to be "the leading European authority on dangerous cargo", unequivocally state this conclusion. Therefore, the presence of a tarpaulin, by protecting the stow from the sun's rays, would not have prevented this fire.

Nor would a tarpaulin have afforded protection from ignition due to creosote oil or gases. A tarpaulin could have done so only if the creosote oil and gases could not impregnate the tarpaulin or if the tarpaulin was itself not inflammable. Neither is the fact. Libelants' Exhibit 38, an order issued by respondent that naphthalene must not be stowed on hatches, contains the sentence "This material permeates tarpaulins and hatch boards and in a recent instance damaged cargo and necessitated replacement of ceiling". Thus the creosote oil and gases could impregnate the tarpaulin and thereby make the tarpaulin as inflammable as the impregnated bagging. There is no claim that tarpaulins are not inflammable. In fact, Captain Harris, an employee of Moore-McCormack Lines, Inc., testified in both direct and cross-examination to having seen tarpaulins burn. Thus the failure to cover the stow with a tarpaulin could not have been a contributing cause of the fire.

The effect of the above discussion is that I hold that there is no proof that the fire was caused by the negligence of either petitioner or respondent.

■■ In deciding that petitioner and respondent have not been proved to be guilty of negligence I recognize that they are required to exercise a higher degree of care for the safety of passengers than for the safety of cargo. Maibrunn v. Hamburg-American S.S. Co., 2 Cir., 77 F.2d 304; Moore v. American Scantic Line, 2 Cir., 121 F.2d 767. Nevertheless I find that libelants have not sustained the burden of proof that any failure of petitioner or respondent to exercise the high degree of care which a carrier must devote to the safety of passengers was the proximate cause of any loss or damage.

■ There still remains for my decision the questions whether respondent was negligent in its attempt to extinguish the fire and whether respondent was negligent in its rescue operation.

No serious claim is made that respondent did not do everything within its power to extinguish the fire. Water was applied to the fire immediately after it was discovered and at a time when the fire was still restricted to a small area. There is no evidence which could lead me to believe that respondent's failure to extinguish the fire, after four and a half hours of fighting it, was due to any fault on its part. From the evidence, I believe that the officers and crew of the Black Gull did the best possible job against an unbeatable fire.

Passenger libelants allege that the passengers were further injured due to negligent use of the lifeboats. They contend that as soon as the severity of the fire was discovered the port lifeboat should have been lowered in order to prevent its destruction. In addition, they claim that the starboard lifeboat, after they were in it, was kept moored to the Black Gull and that this resulted in scorching which in turn forced them into the water.

The reason that the master gave for not lowering the port lifeboat was that it would have required sending men into an area close to the fire. This, he felt, would have unnecessarily placed those men in a potentially dangerous situation. In addition, the starboard lifeboat had sufficient room for all members of the crew and passengers. There was, therefore, no absolute necessity for saving the port lifeboat. Once the port lifeboat was

destroyed, however, it was necessary to keep the starboard lifeboat close to the vessel to take on the members of the crew if total abandonment of the vessel was ordered. Thus it was necessary to keep the lowered starboard lifeboat close to the burning vessel.

As a matter of fact it was not proved that keeping the lifeboat moored to the vessel resulted in the scorching and submersion. The starboard lifeboat, with the passengers in it, was let down from its davits on the midships building. It was then hauled forward in order to have it forward of the fire. The wind and sea were coming from the starboard side and the boat was shipping water. At the same time water from the fire hoses was running through the scuppers on deck down into the boat. The second officer, who was in the boat, cut the painter which moored the boat to the vessel and the members of the crew in the boat tried to get the boat clear of the ship's side. The ship had headway, however, and they were unable to get the boat far enough from it before the boat got abreast of the fire at number 4 hatch to avoid the scorching of the heat. The second officer therefore ordered all to go overboard on the lee side of the boat and hang onto the lifeline. After the boat passed number 4 hatch they all got into the lifeboat again. With only four oars in use and without rowing the lifeboat was kept near the ship. Four members of the crew thereafter jumped overboard from the ship and were picked up. Then all the rest of the crew, except the four who lost their lives, came aboard from the vessel. All in the boat were rescued by the Gripsholm.

I need not determine from my hindsight knowledge whether I would have followed a different plan in abandoning the vessel. I cannot say that the master's choice in not saving the port lifeboat was negligence. At that time, it was foreseeable that the fire would be extinguished. Therefore he saw no need to send men into the fire area to lower the port lifeboat. Once that lifeboat was destroyed, the master had no alternative but to keep the starboard lifeboat available to rescue all persons on board the vessel. Since the boat had to be kept available it was natural to keep it moored until it appeared that the sea against the side of the vessel and the water from the scuppers were filling it. There is no suggestion that the cutting of the painter was negligent or that the failure to get far enough from the ship to avoid scorching as the boat passed number 4 hatch was negligent. Since passenger libelants' criticism is that the boat was kept moored, their position must be that it was negligent to moor the boat to the ship until it appeared that the boat was in danger of filling instead of trying to get clear of the ship as soon as the boat was in the water. There is, however, no reason to believe that, if they had tried to get clear of the ship immediately they would have been any more successful in getting away from the effective range of the fire. No attempt was made to show that the fire was any hotter when the boat finally passed it than when the boat was first launched.

There is therefore no negligence proved in the fighting of the fire or in the rescue operations.

I therefore grant the petition for exoneration from liability and deny libelants any recovery.